*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0149p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SHIRLEY JOHNSON, as Legal Guardian of MICHAEL
GILFEATHER, an Incapacitated Adult,

*Plaintiff-Appellant,*

No. 06-5145

*v.*

MANITOWOC BOOM TRUCKS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 02-00080—Juliet E. Griffin, Magistrate Judge.

Argued: March 16, 2007

Decided and Filed: April 30, 2007

Before: KENNEDY, MARTIN, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Benjamin E. Baker, Jr., BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, Montgomery, Alabama, for Appellant. Patrick W. Schmidt, QUARLES & BRADY, Milwaukee, Wisconsin, for Appellee. **ON BRIEF:** Benjamin E. Baker, Jr., BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, Montgomery, Alabama, for Appellant. Patrick W. Schmidt, Patrick S. Nolan, QUARLES & BRADY, Milwaukee, Wisconsin, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. In this products liability case, Plaintiff Michael Gilfeather, who was severely injured in a workplace accident involving a truck-mounted crane manufactured by Defendant Manitowoc Boom Trucks, appeals from the magistrate judge's grant of summary judgment in favor of Defendant. Plaintiff also appeals the magistrate judge's decision to exclude his primary expert witness for failure to meet the reliability factors outlined in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). We now affirm.

## I

On October 15, 2001, Michael Gilfeather was working on a job site near Cookeville, Tennessee. He and two other workers, Delayne Williams and Bruce Williams, were installing a new

1

cell phone tower with the aid of a "boom truck crane" manufactured by Manitowoc. This crane, also known as the Manitowoc 2592 (after its model number), is basically a 10-wheel flatbed truck with a crane mounted on the bed. The crane sits on a large turret, and thus can swivel a full 360 degrees. The "boom" of the crane then extends hydraulically, from a length of 28 feet in its fully retracted position to a length of 92 feet when fully extended. The Manitowoc 2592 is capable of hoisting and moving very large materials and equipment at a construction site, up to a maximum weight of 50,000 pounds (25 tons). When the crane is in operation, the truck is secured by two front "outriggers" and two rear "stabilizers." The rear stabilizers extend down and meet the ground at a 90-degree angle, whereas the front outriggers extend out from the frame of the truck at a 45-degree angle, much like the legs of a spider.[1]

Delayne Williams, who had been operating the crane for much of the day, had to leave the job site early but could not do so because one of the front outriggers was blocking his sport-utility vehicle. At the suggestion of Gilfeather, he partially retracted this outrigger, such that it was no longer in contact with the ground. Delayne Williams drove out, but at this precise moment Bruce Williams attempted to use the crane to move some heavy materials. Without its fourth outrigger on the ground, the Manitowoc 2592 fell over, severely injuring Gilfeather.

The accident left Gilfeather physically and mentally incapacitated to the extent that he was unable to bring the present diversity suit against Manitowoc on his own behalf. Rather, he now proceeds through his legal guardian, Shirley Johnson. Gilfeather's primary allegation was that the Manitowoc 2592 was defective and/or unreasonably dangerous, both because of an unsafe design and because of inadequate warnings. Gilfeather proposed only one expert witness, Gary Friend, to support his claims. Friend is a registered professional engineer in the states of Illinois and Missouri. After receiving his master's degree in engineering in 1969, he taught engineering at a community college in Kansas City, Missouri, for ten years. Since approximately 1980, however, he has been employed exclusively as an engineering "consultant" and has testified in a wide range of design defect cases. As the magistrate judge noted, he has rendered opinions on the design of "almost any machine," including a "wheelchair, a deep fat fryer, a passenger elevator, an antique replica shotgun, a hay baler, a meat tenderizer, a forklift, a manure spreader, a lawn mower, a seat belt assembly, a log skidder, a concrete saw, a trampoline, and a tree stand." *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F. Supp. 2d 852, 858 (M.D. Tenn. 2005).

Friend's preparation for the instant case consisted primarily of document review: deposition testimony, discovery responses, brochures and owners' and operators' manuals for a variety of truck cranes, American National Standards Institute ("ANSI") standards for different kinds of mobile boom trucks, statements of persons in the area of the accident, and the Tennessee Occupational Safety and Health Administration ("TOSHA") report of the accident with accompanying photos. He also personally inspected and photographed the subject truck crane. Based on this research, Friend prepared a report in which he opined that the Manitowoc 2592 was defectively designed because its outriggers were not electronically linked to the crane operation via an "interlocking" system. By means of such an interlocking system, if any one outrigger were not in contact with the ground (as measured by pressure asserted on the foot of the outrigger), the boom crane would "lock" and become inoperable until such time as the outrigger was put back down onto firm ground. An interlocking outrigger system, according to Friend, would have prevented Gilfeather's accident, because Bruce Williams would not have been able to operate the crane with the front outrigger retracted, and thus the boom truck would not have tipped over onto Gilfeather.

---

[1] Although we recognize that the Manitowoc "outriggers" (in the front of the truck) and "stabilizers" (in the rear) are distinct devices, for the remainder of the opinion we will refer to them collectively as "outriggers."

Friend focused in particular on brochures and manuals for the Asplundh "line lift bucket truck," a machine that has had an interlocking outrigger system since 1978. The Asplundh truck is significantly smaller than the Manitowoc 2592. Such trucks are generally only rated to carry *people*, in a bucket mounted on the end of the crane arm. They are typically used for jobs such as telephone repair work or tree trimming and removal. They are not rated to carry nearly the amount of weight that the Manitowoc 2592 can lift. At the same time, however, the Asplundh truck is by no means a small machine, and the weight of the crane alone (not to mention the torque placed on the truck when the crane extends outward) is sufficient to require outriggers on the Asplundh when the crane is in operation. After reviewing the mechanics and electronics of the Asplundh, Friend presented a detailed schematic, Joint App'x at 666, in which he attempted to diagram how the Asplundh interlocking system could be fitted to the Manitowoc 2592. He did not actually test his schematic, however — in other words, he conducted no empirical research to determine just how functional his proposed retrofit of the Manitowoc 2592 might be. Friend also opined that the Manitowoc 2592 "should have included a specific warning to operators about the possibility that the crane might tip over with the outriggers in the up position while rotating the boom with no load on it."

Manitowoc moved to exclude Friend's proposed testimony, arguing for a variety of reasons that it was unreliable. The magistrate judge, whom the parties had consented to conduct all proceedings, granted Manitowoc's motion to exclude. Having stricken Friend's testimony, the magistrate judge then granted Manitowoc's motion for summary judgment on grounds that under Tennessee law, expert testimony is absolutely required for a products liability action to proceed. Gilfeather now appeals.

## II

Tennessee products liability law, which both parties agree applies to this diversity case, recognizes two different tests for determining whether a product is unreasonably dangerous. The first, the **consumer-expectation test**, is used where a product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527, 530 (Tenn. 1996); *see also Brown v. Raymond Corp.*, 432 F.3d 640, 643-44 (6th Cir. 2005). The second, the **prudent-manufacturer test**, imputes knowledge of the dangerous condition to the manufacturer, and then asks "whether, given that knowledge, a prudent manufacturer would market the product." *Ray*, 925 S.W.2d at 530. As the Tennessee Supreme Court has articulated, "[t]he consumer expectation test is, by definition, buyer oriented; the prudent manufacturer test, seller oriented." *Id*. at 531.

Both parties recognize that the prudent-manufacturer test is best applied to this case because it involves "establishing the unreasonable dangerousness of a complex product about which an ordinary consumer has no reasonable expectation." *Id*. And where the prudent-manufacturer test applies, "expert testimony about the prudence of the decision to market" becomes essential to a plaintiff's case in chief. *Id*.; *see also Brown*, 432 F.3d at 644. Thus, although Gilfeather raises two issues for review, the exclusion of his expert is really the whole ballgame: without the expert, he stands little chance of overcoming summary judgment.

Fed. R. Evid. 702, which deals with the testimony of experts, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule, amended in 2000, reflects the Supreme Court's decisions in *Daubert* and *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999). "In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science." Advis. Comm. Notes to Fed. R. Evid. 702. As "gatekeeper," the trial judge is imbued with discretion in determining whether or not a proposed expert's testimony is admissible, based on whether it is both relevant and reliable. *Kumho*, 526 U.S. at 147. Relevance is not at issue in this case. The magistrate judge found that Friend's proposed testimony was "clearly relevant," and neither party disputes this finding on appeal. The only contested issue is reliability.

In *Daubert*, the Supreme Court provided a nonexhaustive list of factors which may, in any given case, bear on a trial judge's gatekeeping determination. These factors include: (1) whether a "theory or technique . . . can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." 509 U.S. at 592-94. Six years after issuing *Daubert*, the Court made clear in *Kumho* that these same factors are as applicable in the context of "engineering" testimony as in "scientific" testimony. The whole point of *Kumho*, after all, was that the distinction between "scientific knowledge" (at issue in *Daubert*) and "technical or other specialized knowledge" (at issue in *Kumho*, as here) is fuzzy at best. 526 U.S at 148.

The *Kumho* Court also made clear that in the engineering context especially, the factors listed above do not constitute a "definitive checklist or test." *Id*. at 150 (quoting *Daubert*, 509 U.S. at 593). Rather, "the gatekeeping inquiry must be tied to the facts of a particular case," depending on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. This very flexible inquiry requires a reviewing court to be highly deferential when assessing not just a trial court's analysis of each factor, but also the trial court's initial selection of which factors are relevant to the case at hand. As Justice Breyer noted, "[t]he trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Id*. at 152 (emphasis in original); *see also Brown*, 432 F.3d at 647 (noting that because our review in such cases is for abuse of discretion, we must grant the judge "broad latitude in determining the reliability or relevance of the testimony") (internal quotation marks omitted).

### III

In the instant case, the magistrate judge looked at the four *Daubert*/*Kumho* factors listed above and determined that only three of them were relevant: (1) the extent to which the opinions of Gary Friend had been tested; (2) the extent to which his opinions had been subjected to peer review or publication; and (3) the extent to which his theory regarding interlocking outriggers had gained general acceptance within the engineering/manufacturing community. Onto these three factors, however, the magistrate judge grafted a fourth, one which had not been mentioned by the Supreme Court in either *Daubert* or *Kumho*. That fourth factor, as the magistrate judge put it, was "the extent to which Mr. Friend's opinions were prepared in the context of litigation."

We now review, under an abuse-of-discretion standard, the magistrate judge's decision using the reliability factors she selected. We note at the outset that the second factor identified by the magistrate judge is largely insignificant in this case, because both parties concede that there is little in the way of published or peer-reviewed information—at least in the sense contemplated by *Daubert* or *Kumho*—on interlocking outrigger systems for truck cranes. *See Johnson*, 406 F. Supp. 2d at 863. We therefore decline to discuss this factor in greater detail, focusing below on: (A) the

"testing" factor; (B) the "general-acceptance" factor; and (C) the "prepared-solely-for-litigation" factor.

### A.  The Testing Factor

The magistrate judge made clear that her decision to exclude Friend rested largely on the fact that while he had drawn up a schematic for how Asplundh's interlocking outrigger system might be integrated into the Manitowoc 2592, he had entirely failed to test his theory.  As the following deposition testimony reveals, Friend admitted that no testing had occurred:

> **Q:** Have you ever actually implemented this kind of design concept that you have on Exhibit 12 on any machine?
> **A:** No.
> **Q:** You certainly haven't implemented it or tested it with regard to the Manitowoc machine, have you?
> **A:** That's correct.
> **Q:** And it would be true that you've never implemented or tested this concept on any other machine, correct?
> **A:** That's correct.
> **Q:** And when you were back doing design work, before you would release some new design or modification of the design to the field, you would normally do testing, correct?
> **A:** Depending on what it is.  Normally I would say you test, but not all the time, but generally you do, yes.
> **Q:** With this system, you would want to test it, wouldn't you?
> **A:** I would, certainly.  Well, certainly, yeah.

Friend Dep. at 145-46.

Given the difference in size (small truck versus large truck), lifting capacity (a few people versus 25 tons), and function (tree trimming or electrical work versus heavy construction) between the Asplundh and Manitowoc crane systems, the magistrate judge concluded that at least a modicum of empirical testing should have been performed in order to determine how easily an interlocking outrigger system could be installed onto the Manitowoc 2592, as well as whether such a system would bring with it any downsides in safety and/or function.  After all, "the design of industrial equipment is a complex process and changes to prevent one problem could create other problems, thus increasing the overall danger of using a product." *Brown*, 432 F.3d at 648 (quotations omitted); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (noting that many alternative design considerations "are product- and manufacturer-specific and cannot be reliably determined without testing").

When further questioned about why he did not conduct any tests of his proposed alternative design, Friend responded as follows:

> **Q:** As a design engineer, you certainly wouldn't want to add a system that included or added some downside risks, would you?
> **A:** No.
> **Q:** And that's something you would want to analyze as you went along in your concept development and your testing and then eventually release to production.
> **A:** Certainly.
> **Q:** And you didn't do that in this case, specifically by putting it on a product and testing it and looking at it and considering the downsides, did you?

**A:** Well, I — I just didn't do the testing part. I really don't see a downside to this system.
[ . . . ]
**Q:** Is it your testimony that you see absolutely no downsides or negatives to the system that you have set forth on Friend Exhibit 12 for use on this particular truck crane?
**A:** Other than if you want to call adding cost into the machine, certainly that would be a downside — it's going to cost a little more — . . . . From a safety standpoint in — in the use of your equipment, it's — it's all pluses.

Friend Dep. at 147-48. With this testimony in front of us, we must ask whether or not a trial judge abuses her discretion by choosing not to rely solely on the say-so of a proposed expert witness. *See, e.g.*, *Dhillon*, 269 F.3d at 870 (noting that "hands-on testing is not an absolute prerequisite to the admission of expert testimony," but where a theory easily lends itself to testing and substantiation, "conclusions based only on personal opinion and experience do not suffice").

One way to overcome the testing requirement might be to show that the expert has significant technical expertise in the specific area in which he is suggesting an alternative design. For this proposition, Gilfeather relies on *Bah v. Nordson Corporation*, No. 00CIV9060DAB, 2005 WL 1813023 (S.D.N.Y. Aug. 1, 2005). In *Bah*, the district judge admitted the testimony of an expert who suggested that an "interlock switch" on a hot glue dispenser—not dissimilar from the interlocking outrigger concept here—could have prevented an accident to the plaintiff. *Id.* at *3-4. The proposed expert did not "create prototypes or drawings of any of his proposed safety devices," nor did he "test or review others' tests of any of these devices." *Id.* at *5. However, he had for over twenty years been involved with designing safety interlocks in machines very similar to the one at issue in *Bah*. Because the reliability inquiry is a flexible one and may "focus upon personal knowledge and experience," *Kumho*, 527 U.S. at 150, the *Bah* court held that the expert's "extensive experience" with the very types of machines at issue in the case rendered his testimony reliable, "even without consideration of the *Daubert* factors." 2005 WL 1813023 at *8.

The facts in the instant case are not on par with those in *Bah*. On the one hand, based on Friend's extensive engineering expertise, his interlocking outrigger proposal seems like an eminently reasonable one. On the other hand, given the difference between the machine on which the interlocking system existed (the Asplundh) and the machine on which Friend suggested it could easily be installed (the Manitowoc 2592), it also seems reasonable for a judge to have shut the gate on Friend because he had made no attempt whatsoever to test the interlock system in the larger machine. The magistrate judge might have abused her discretion had Friend been particularly experienced in the area of truck outriggers, or cranes, or the like, but the record indicates that he is not. Friend's self-serving testimony that he is qualified to render an opinion on the design of "almost any machine" undercuts any claims of *specific* expertise that he might hope to make. Friend may well be a fine engineer, but he is clearly a generalist. As such, even if the logic of *Bah* were binding on this Court (which it is not, seeing as it stems from a district court in a different circuit than our own), it would not apply to the case at hand.

Gilfeather argues that testing was not required in this case because Manitowoc's own engineers testified that such an interlocking system would be "a good thing to put on [our] vehicle" assuming it did not "impede the utility of the vehicle" and did not "create unsafe conditions." Yet these statements only undermine Gilfeather's position, because they reveal why an expert's testing, at least in some form, is so important in a case like this. To decide the case, a jury would have to be presented with evidence of whether the Asplundh interlocking system could easily have been fitted onto the Manitowoc 2592 when it was produced and sold to buyers in 1999, and whether such alteration would negatively have affected the truck's safety or performance. Should a one-page

diagram that is nothing more than an engineer's version of cut-and-paste suffice as such evidence? Of course not.

In fairness to Gilfeather (and Friend), it will not always be clear how an expert is to "test" an expensive mechanical or electrical system such as the Manitowoc 2592 without access to the exact—and potentially proprietary—plans for the system, and without a significant financial outlay. As one district judge in this circuit has noted:

> Given inherent limitations on access to relevant data, the plaintiff is not required to establish with particularity the costs and benefits associated with the adoption of the suggested alternative design. The plaintiff is not required to produce a prototype design in order to make out a prima facie case. "[Q]ualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale."

*Martin v. Michelin North America, Inc.*, 92 F. Supp. 2d 745, 753 (E.D. Tenn. 2000) (quoting Restatement (Third) of Torts § 2 cmt. f (1998)). While *Martin* does not require that a "prototype" be built in all instances, however, it still insists on expert testimony that "reasonably supports the conclusion that a reasonable alternative design could have been *practically* adopted at the time of sale." We can imagine innumerable tests that could have been conducted by Friend—all well short of building a full-fledged prototype of the Manitowoc 2592, but all well beyond drawing a one-page diagram—that would have demonstrated the practicality of his proposed design. And yet Friend failed to conduct any testing at all.

## B. The General-Acceptance Factor

Although Friend's complete failure to test his proposed design cuts heavily against him, he was able to point to one very important, and very simple, fact about interlocking outriggers: that boom crane trucks similar to the Manitowoc 2592, made by some of Manitowoc's competitors, currently have an interlocking outrigger system in place. This fact, the plaintiff argues, indicates that interlocking outriggers have become generally accepted within the truck crane industry, even for large truck cranes like the Manitowoc 2592, and thus Friend's proposed testimony fits well within one of the *Daubert* factors.

The problem with this argument is temporal. While it may be true that interlocking outriggers have *now* become (or are on their way to becoming) the industry standard, the same cannot be said for the year 1999, when the Manitowoc 2592 was put into the marketplace. As Friend's deposition testimony reveals:

> **Q:** And in terms of the items that were reflected in those brochures, the Altec and QMC brochures . . . the Altec was dated 2004, as I recall, and the QMC was off the Internet I think in December of 2004 — I take it you don't know one way or the other whether those features that you talked about, the interlock on those particular kinds of cranes for those particular manufacturers, were available in '99, do you?
> **A:** I don't know. That's right, I don't.
> [ . . . ]
> **Q:** Would you agree with me, sir, that based on what you do know about truck cranes — and let's say before the year 2000 — that it was not the industry practice to include interlocks on the outriggers?
> **A:** I would say that you're probably correct. I don't know for a fact.
> [ . . . ]

> **Q:** And sitting here today, you certainly can't say that there was any manufacturer of mobile truck cranes of the type and style and function and use of the Manitowoc 2592 who had interlocks on their outriggers prior to 2000, correct?
> **A:** I know of no one. . . .

Friend Dep. at 152-54. Under Tennessee law, "[a] manufacturer or seller of a product *shall not be liable* for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous *at the time it left the control of the manufacturer or seller*." Tenn. Code Ann. § 29-28-105(a) (emphases added). Thus, by the very terms of Tennessee products liability law, any evidence that interlocking outrigger systems are currently available on truck cranes similar to the Manitowoc 2592 is unavailing to Gilfeather. The evidence presented by Friend simply indicates that interlocking outrigger systems have been around for a long time on some kinds of truck cranes, such as the Asplundh, but not other kinds, such as the Manitowoc 2592. This is not enough to show that at the time the Manitowoc 2592 was sold in 1999, it was "industry custom"—i.e., "generally accepted"—for all such machines to have interlocking outrigger systems. If we were to bless a rule to the contrary, we would pave the way for retroactive imposition of liability in products liability cases such as this one. We decline to run afoul of Tennessee state law in this manner.

### C. The Prepared-Solely-for-Litigation Factor (a.k.a., The Flowing-Naturally-from-Independent-Research Factor)

This Court has recognized for some time that expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution. For example, in a decision predating *Daubert*, this Court pointed out that "expert witnesses are not necessarily always unbiased scientists," because they are "paid by one side for their testimony." *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992); *see also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006) ("We have been suspicious of methodologies created for the purpose of litigation."); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) ("If anything, *Kumho* supports the magistrate judge's consideration of factors not mentioned by the Supreme Court, including the fact that [the expert's] study was conducted and the experts' opinions were formed for purposes of litigation."); *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed. Appx. 479, 484 (6th Cir. 2002) (noting that the prepared-solely-for-litigation factor is often assessed in addition to those specifically enumerated in *Daubert*); *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (same).

Perhaps the best explication of the prepared-solely-for-litigation factor comes not from this circuit, but from the Ninth Circuit, when it revisited the *Daubert* case after the Supreme Court sent it back on remand. *See Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311 (9th Cir. 1995) ("*Daubert II*"). In that case, the prepared-solely-for-litigation test was layered onto the four factors previously articulated by the Supreme Court. The Ninth Circuit stated:

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office. . . . That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with

the dictates of good science. . . . If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles."

43 F.3d at 1317-18 (internal citations omitted). Of course, *Daubert II* involved scientific experts, not technical or engineering experts as is the case here, but the Ninth Circuit's reasoning is equally sound in both contexts. And the Ninth Circuit continues to apply this formula today. *See, e.g.*, *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001).

In the instant case, the magistrate judge viewed the prepared-solely-for-litigation factor as a very important one. This factor, along with Friend's failure to test his model, was largely responsible for the magistrate judge's decision to exclude. As the magistrate judge concluded:

> The plaintiff's expert in this case appears in many ways to be the quintessential expert for hire. Though he is indisputably a mechanical engineer with good qualifications and an impressive resume, he has nonetheless spent the last twenty plus years of his life testifying as an expert in a wide variety of design defect cases. . . . Consideration of the context of an expert's opinion is especially important given the potential for abuse in light of the incredible benefits of hindsight. Here, the expert's opinions were conceived, executed, and invented solely in the context of this litigation. The expert here does not even offer a proposed design that would necessarily make this crane safer; he merely offers a mechanism that might have prevented a very specific accident that occurred under very specific conditions.

*Johnson*, 406 F. Supp. 2d at 865-66.

We find the magistrate judge's above analysis to be quite lucid and quite correct. If it is clear that a proposed expert's testimony flows naturally from his own current or prior research (or field work), then it may be appropriate for a trial judge to apply the *Daubert* factors in somewhat more lenient fashion. This would not mean that such an expert is to be accorded a presumption of reliability, but it would be in line with the notion that an expert who testifies based on research he has conducted independent of the litigation "provides important, objective proof that the research comports with the dictates of good science." *Daubert II*, 43 F.3d at 1317. However, if a proposed expert is a "quintessential expert for hire," then it seems well within a trial judge's discretion to apply the *Daubert* factors with greater rigor, as the magistrate judge seems to have done in this case.[2] Such an expert is not be accorded a presumption of *un*reliability, but the party proffering the expert must show some objective proof—such as the expert's extensive familiarity with the particular type of machine in question, as in *Bah*—supporting the reliability of the expert's testimony. *Daubert II*, 43 F.3d at 1317-18 ("If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence . . . ."). The magistrate judge in this case searched high and low for such objective proof and found it sorely lacking. *See Johnson*, 406 F. Supp. 2d at 866 ("Mr. Friend's opinions were prepared entirely in preparation for this litigation, and therefore lack any indicia of reliability they may have otherwise possessed by virtue of arising naturally and independently.").

---

[2]A trial judge's assessment of the prepared-solely-for-litigation factor is not, of course, a totally binary exercise. We recognize that many experts may look neither quite like the "quintessential expert for hire" in this case nor quite like a pure research scientist/engineer whose loyalties are to the laboratory/field and not the courtroom.

**D. Summary Judgment**

Gilfeather all but concedes that without the testimony of Friend, he cannot survive summary judgment. Appellant's Br. at 43 ("[I]f the Plaintiff is allowed to present the expert testimony of Gary Friend, the Plaintiff will have met her burden under Tennessee law and summary judgment is inappropriate."). Gilfeather does make a brief attempt to argue that even without Friend, the testimony of the experts put forward by his opponent, Manitowoc, should suffice to get past summary judgment. *See id*. at 17-18; Reply Br. at 9-10. This argument is without merit. An appellant cannot overcome summary judgment in a case such as this simply by cherry-picking statements from an appellee's experts' opinions, when the overall conclusions of those experts run contrary to the appellant's position. The appellant could introduce a reliable expert to dissect the opinions of the appellee's experts, but that of course is what Gilfeather has tried and failed to do with Friend.

In sum, given our conclusion that the magistrate judge did not abuse her discretion in excluding Friend's testimony, we must also affirm the grant of summary judgment in favor of Manitowoc.

**IV**

Based on the magistrate judge's thorough analysis of the testing factor, the general-acceptance factor, and the prepared-solely-for-litigation factor, we conclude that she acted well within her discretion to exclude the testimony of Friend. The most obvious cure would have been for Friend to have produced at least *some* empirical testing data on his proposed alternative design. This he entirely failed to do. Another cure would have been for Gilfeather to have found someone with expertise more directly related to the large truck and/or truck crane industry. Such an expert might have been spared the *Daubert* testing factor, as in *Bah*. And such an expert would probably look much less like the generalist "expert for hire" epitomized by Friend. In any event, if the trial court is to be granted "broad latitude" both in selecting appropriate reliability factors for a given case as well as in applying each of those factors to the case's facts, *Kumho*, 526 U.S. at 152-53, then we cannot conclude that the magistrate judge exceeded this latitude in the instant case.

We therefore affirm.