DISSENT
BOYCE F. MARTIN, JR., Circuit Judge,
dissenting.
The majority finds that the district court abused its discretion in admitting Dr. Walter Carlini’s testimony because it “went beyond the boundaries of allowable testimony under rule 702” {ante at 669-70), because it was “speculative” {ante at 670), and because his deductions required “leaps of faith.” {Ante at 670.) Because the majority reached this conclusion by acting as sitting judges rather than under the proper standard of review, I respectfully dissent.
I.
Jeff Tamraz’s case is part of a larger multi-district litigation regarding inhalation of manganese fumes by welders. In re Welding Rod Prods. Liab. Litig., 269 F.Supp.2d 1365 (J.P.M.L.2003). In April, May, and June 2005, the multi-district litigation court conducted three weeks of Daubert hearings to test the methodologies of expert witnesses. As part of the hearing, experts in the neurological community testified regarding the connection between manganese exposure and various forms of parkinsonism. The court also heard argument on the defendants’ motion to preclude evidence that manganese exposure causes Parkinson’s Disease. The trial court concluded that the evidence proffered was “sufficiently reliable to support the assertion that exposure to welding fumes can cause, contribute to, or accelerate a parkinsonian syndrome that some doctors can diagnose as [Parkinson’s Disease] ... at least in the abstract, as the question is presented here.” (Corrected J.A. at 166, Order, Aug. 6, 2005).
Jeff Tamraz worked as a welder from 1979 to 2004. Around 2000-2001, he began experiencing severe neurological symptoms, which eventually became so severe that he cbuld not care for himself. In July 2007, Tamraz brought suit in the United States District Court for the Northern District of Ohio against the five defendants who provided the welding materials that Tamraz used during his welding career. He claimed that his neurological injuries, which manifested symptoms *679 consistent with Parkinson’s Disease, were caused by manganese exposure.
Before trial, the defendants moved to exclude parts of the testimony to be presented by one expert, Dr. Carlini. On November 1, 2007, the court ruled on the motion, stating:
I have read all of the briefs. I have read ... the two depositions that were taken of Dr. Carlini. I have gone back and reread the Court’s Daubert opinion, which was on the main MDL docket ... and I have decided that I am going to deny the defendants’ motion.
To a large extent, the defendants’ motion asks the Court to draw bright lines regarding diagnoses of movement disorders that I have already declined to draw, and I have already decided that the current state of the science does not require to be drawn.... I see nothing about [Dr. Carlini’s] methodology that is either flawed or inconsistent with the very diagnostic methods that other experts in this case, both the plaintiffs and the defendants’ experts alike, have used and have described as appropriate diagnostic methods.... It is clear that the defendants have fair grounds to attack the somewhat unusual diagnosis that Dr. Carlini renders in this case ... but that to me goes to the weight and not the admissibility of his testimony.
(Corrected J.A. at 170-173, Tr. of Proceedings, Nov. 1, 2007).
At trial, four experts testified regarding the cause of Tamraz’s injury. Tamraz’s primary medical expert, Dr. Paul Nausieda, testified that Tamraz suffered from manganese-induced parkinsonism. The defendants’ lead medical expert, Dr. Anthony Lang, while testifying that manganese exposure can cause parkinsonism, stated that he did not believe that Tamraz’s parkinsonism was caused by manganese exposure. Tamraz’s former treating neurologist, Dr. Michael Siegel, first diagnosed Tamraz with an unusual form of Parkinson’s Disease due to manganese poisoning. He later revised his opinion to state that, while he could not rule out the possibility than manganese exposure caused Tamraz’s injury, Tamraz likely suffered from parkinsonism resulting from factors other than manganese exposure. Finally, Dr. Carlini testified that Tamraz likely had a genetic predisposition to Parkinson’s Disease and that exposure to manganese triggered his Parkinson’s to develop. The jury found defendants liable and awarded Tamraz a total of $20.3 million in compensatory damages.
Defendants appealed, claiming that the district court erred in admitting Dr. Carlini’s testimony because it was speculative and not based upon published literature or scientific studies. The majority agrees and reverses the district court’s decision. For the reasons that I will discuss below, I respectfully disagree with the majority’s reasoning and conclusions.
II.
As the majority correctly notes, “[t]his court reviews a district court’s decision concerning expert testimony for abuse of discretion.” Popovich v. Sony Music Entertainment, 508 F.3d 348, 359 (2007) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152-53, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Unfortunately, while paying lip service to the correct standard, the majority actually applies a de novo standard of review. As we have held, “A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence.” Ky. Speedway, LLC v. Nat'l Assoc. of Stock Car Auto Racing, Inc., 588 F.3d 908, 915 (6th Cir.2009) (quoting Brown v. Raymond Corp., 432 F.3d 640, 647 (6th Cir.2005)) (internal quotation marks omitted). “Thus, we will not *680 substitute our own judgment for that of the district court and will reverse an evidentiary decision ‘only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment.’ ” In re Scrap Metal Litigation, 527 F.3d 517, 528 (6th Cir.2008) (quoting Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 781 (6th Cir.2002)); see also Nolan v. Memphis City Schools, 589 F.3d 257, 265 (6th Cir.2009) (holding that “[b]road discretion is given to district courts in determinations of admissibility ... and those decisions will not be lightly overturned.”).
“[Abuse of discretion review] requires a reviewing court to be highly deferential when assessing not just a trial court’s analysis of each [Daubert ] factor, but also the trial court’s initial selection of which factors are relevant to the case at hand.” Johnson v. Manitowoc Boom Trucks, Inc. 484 F.3d 426, 430 (6th Cir.2007). It is within the district court’s discretion to determine whether the testimony provided is inadmissible “junk science” or testimony falling within the “range where experts might reasonably differ.” Kumho, 526 U.S. at 153, 119 S.Ct. 1167. Thus, we must conduct our review of that decision with great deference.
Here, because the district court found that Dr. Carlini’s “methodology ... [was neither] flawed or inconsistent with the very diagnostic methods that other experts in this case, both the plaintiffs and the defendants’ experts alike, have used and have described as appropriate diagnostic methods”, (corrected J.A. at 170-173, Tr. of Proceedings, Nov. 1, 2007), it is far from apparent that the district court should have found Dr. Carlini’s testimony to be unreliable. While the district court acknowledged that Dr. Carlini’s diagnosis was “unusual”, nothing in Daubert and its progeny indicates that an unusual diagnosis alone renders a district court’s decision to admit an expert’s testimony an abuse of discretion. Here, the district court reasonably evaluated Dr. Carlini’s testimony in light of a broad range of expert opinions and found that it was sufficiently reliable to be admissible. As it was not a clearly erroneous decision so as to constitute an abuse of discretion, the district court’s judgment should be affirmed.
Expert testimony is inherently difficult to evaluate. It is all the more so outside the context of a trial. This is why the application of Daubert is flexible. It is why the district court, which is able to hear and evaluate experts first-hand, is given such broad latitude in determining whether testimony is admissible. That same reasoning counsels that this Court interfere only in cases where it is absolutely clear that the testimony is nothing more than “junk science” that the jury cannot be trusted to evaluate. That is not the case here.
In reversing the district court’s decision, the majority substitutes their opinion for that of the district court and exercises a standard of review closer to de novo than abuse of discretion. The upshot of the majority’s opinion is that they would have found Dr. Carlini’s testimony inadmissible had they been the trial judge, which would be acceptable if we reviewed this case de novo. However, the majority does little to explain why the district court’s decision to admit Dr. Carlini’s testimony was “arbitrary, unjustifiable, or clearly unreasonable”, Plain Dealer Pub. Co. v. City of Lakewood, 794 F.2d 1139, 1148 (6th Cir. 1986), as they must do if they wish to reverse the district court’s evidentiary conclusions under the abuse of discretion standard. Although they go to great lengths to explain why they are dissatisfied with Dr. Carlini’s “thriee-speculative” testimony, they have not shown why admitting expert testimony, which relies on *681 “the very diagnostic methods that other experts in this case, both the plaintiffs and the defendants’ experts alike, have used” is an abuse of discretion. (Corrected J.A. at 170-173, Tr. of Proceedings, Nov. 1, 2007). In my view, the majority has, with long arms and short sight, reached much further than our standard of review permits. For these reasons, I cannot join the majority’s opinion.
III.
The majority offers several reasons for reversing the district court’s opinion, none of which I find persuasive. They criticize Dr. Carlini’s testimony for being “speculative” (ante at 670) and for its “leaps of faith.” (Ante at 670.) They also claim that Dr. Carlini confused etiology with diagnosis. (Ante at 673.) They further take issue with the idea of admitting his testimony under a “differential diagnosis” analysis because many incidents of Parkinson’s Disease are idiopathic,[1] a cause which, by its very definition, cannot be “ruled out.” (See ante at 674-75.) I believe that refocusing the question on the underlying issue that Daubert and its progeny intended to address — the exclusion of “junk science” — and reviewing the district court’s evidentiary decisions through the appropriate abuse of discretion lens, leaves us no choice but to affirm the district court’s evidentiary conclusions.

A. Dr. Carlini’s Testimony is Admissible under Daubert

The path charting the judiciary’s standards for admitting or excluding expert testimony- — from the early Frye standard to Kumho’s clarification of Daubert — has been a movement towards granting district judges greater discretion in making expert testimony determinations. See Kumho, 526 U.S. at 137, 119 S.Ct. 1167; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Frye v. United States, 293 F. 1013 (D.C.Cir.1923). Today, that discretion is flexible and very broad. Kumho, 526 U.S. at 153, 119 S.Ct. 1167.
Daubert’s role of ‘ensuring] that the courtroom door remains closed to junk science,’ Amorgianos v. Nat’l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002), is not served by excluding [medical expert] testimony ... that is supported by extensive relevant experience. Such exclusion is rarely justified in eases involving medical experts as opposed to supposed experts in the area of product liability. See generally Daniel W. Shuman, Expertise in Law, Medicine, and Health Care, 26 J. Health Pol. Pol’y & L. 267 (2001) (characterizing the effect of the Daubert and Kumho Tire cases on claims of medical expertise as ‘[m]uch ado about little,’ while noting that these cases have had a significant effect on toxic tort and products liability litigation).
Dickenson v. Cardiac and Thoracic Surgery of E. Tenn., 388 F.3d 976, 982 (6th Cir.2004). “As ‘gatekeeper,’ the trial judge is imbued with discretion in determining whether or not a proposed expert’s testimony is admissible, based on whether it is both relevant and reliable.” Johnson, 484 F.3d at 429 (quoting Kumho, 526 U.S. at 147, 119 S.Ct. 1167). It is for the district court to determine whether expert testimony is essentially “junk science” rather than testimony falling within the “range where experts might reasonably *682 differ.” Kumho, 526 U.S. at 153, 119 S.Ct. 1167.
One way in which a court may make this determination is by examining the expert’s testimony in relation to the factors laid out by the Supreme Court.
“These factors include: (1) whether a theory or technique ... can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique’s operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.”
Johnson, 484 F.3d at 430 (internal quotations omitted). Six years after issuing Daubert, the Supreme Court clarified that “the factors listed [in Daubert] do not constitute a ‘definitive checklist or test.’ ” Id. at 429-30 (quoting Kumho, 526 U.S. at 150, 119 S.Ct. 1167). Our Court has “recognized that the Daubert factors ‘are not dispositive in every case’ and should be applied only ‘where they are reasonable measures of the reliability of expert testimony.’ ” In re Scrap Metal, 527 F.3d at 529 (quoting Gross v. Comm’r, 272 F.3d 333, 339 (6th Cir.2001)). “Rather, the gatekeeping inquiry must be tied to the facts of a particular ease, depending on the nature of the issue, the expert’s particular expertise, and the subject of his testimony.” Id.
While Dr. Carlini testified that he was not able to point to a specific study showing that manganese exposure caused Parkinson’s Disease, his testimony was supported by his own general experience and knowledge (corrected J.A. at 615, Tr. Testimony of Walter Carlini, Sept. 13, 2007), and theoretical medical writing that explored the connection between manganese exposure and Parkinson’s Disease.[2] (Id. at 599, Tr. Testimony of Walter Carlini, Sept. 11, 2007). When asked what publications substantiated his claim, Dr. Carlini clarified that “[t]here is a lot of literature out there about the potential — and it’s all theoretical — about the potential causes for sporadic parkinsonism. And a lot of literature discusses the combination of environmental factors together with genetic predispositions.” (Id.) He further stated that “there is a large likelihood that what we now know as sporadic Parkinson’s disease, which is not understood very well, is due to a combination of environmental factors together with an underlying genetic predisposition. That’s the way the field is moving.” (Id.) He additionally testified that, “there is [sic] a lot of studies or a lot of thinking out there ... which conceptualizes sporadic Parkinson’s disease as being ... a combination of environmental factors and genetic predisposition which is how I conceive of manganese-triggered parkinsonism that falls under that rubric.” (Id. at 600.) He further stated that “there is quite a bit of writing about patients— theoretical writing about patients developing Parkinson’s disease due to a combina *683 tion of genetic and environmental factors.” (Id. at 621, Tr. Testimony of Walter Carlini, Sept. 13, 2007).
Thus, the connection between manganese and Parkinson’s disease, though not agreed upon by every member of the scientific community, was certainly the subject of valid scientific debate and publication at the time of Dr. Carlini’s testimony.[3] The district court succinctly explained its decision not to exclude Dr. Carlini’s evidence, focusing on his methodology: “I see nothing about [Dr. Carlini’s] methodology that is either flawed or inconsistent with the very diagnostic methods that other experts in this case ... have used and have described as appropriate diagnostic methods.” (Id. at 170-173, Tr. of Proceedings, Nov. 1, 2007).
While Dr. Carlini’s testimony may not have satisfied every Daubert factor, it is not necessary that it do so. Johnson, 484 F.3d at 429-30 (holding that the factors do not constitute a definitive checklist or test); see also In re Scrap Metal, 527 F.3d at 529 (holding that the Daubert factors “are not dispositive in every case and should be applied only where they are reasonable measures of the reliability of expert testimony.” (internal quotations omitted)). Dr. Carlini’s testimony easily satisfied at least one Daubert factor because the manganese-Parkinson’s Disease theory was the subject of peer review and publication at the time of Dr. Carlini’s testimony. See infra, n. 2.
Furthermore, to the extent that the connection between manganese and Parkinson’s Disease could be tested at the time, the then-ongoing studies of individuals exposed to manganese, who later developed Parkinson’s Disease, constitutes testing sufficient to satisfy Daubert. Therefore, Dr. Carlini’s testimony appears to meet one, if not several, Daubert requirements. Thus, the district court did not abuse its discretion in admitting it, and the majority errs in so holding.

B. Speculation and Gaps in the Testimony

The majority finds that Dr. Carlini’s testimony was speculative, stating without support that the testimony was “no more than a hypothesis, [and is] thus not ‘knowledge,’ nor is it ‘based upon sufficient facts or data’ or the ‘product of reliable principles and methods ... applied ... reliably to the facts of the case.’ ” (Ante at 670.) I disagree that Dr. Carlini’s testimony was speculative. Based on the record, it seems clear that Dr. Carlini was relying upon scientific studies which tested the causal connection between manganese exposure and Parkinson’s Disease. Furthermore, the district court was exercising its broad discretion when it found that Dr. Carlini’s methodology was reliable and consistent with the diagnostic methods used by other experts in the case. It seems incredible that the majority — exercising a standard of review that seems closer to de novo than abuse of discretion, and without the benefit of having sat through the hearings and seen the experts — finds Dr. Carlini’s testimony to be speculative.
The majority also cites gaps in Dr. Carlini’s testimony as a reason to reverse the district court. (Ante at 670-71.) However, the majority’s newly-minted requirement that scientific testimony must be without flaws or gaps and have no unprovable inferences or assumptions runs counter to any reasonable understanding of how scientific “truth” is reached. “Scientists disprove things. In the process they filter error from theories and methodology, but they do not prove that the surviving meth *684 odologies — those that are left standing or those that are changed to correct errors— are valid.” Jan Beyea & Daniel Berger, Scientific Misconceptions among Daubert Gatekeepers: The Need for Reform of Expert Review Procedures, 64 Law & Con-temp. Probs. 327, 337 (2001). Furthermore, the “theories that survive testing still have components that have never been tested, contain subjective elements, and require that reasonable inferences be made if they are to be used in real world examples.” Id. At least one other Circuit court has found that “to the extent that [the defendant] asserts there were gaps or inconsistencies in the reasoning ... such arguments go to the weight of the evidence, not its admissibility.” Campbell v. Metro. Prop, and Cas. Ins. Co. 239 F.3d 179, 186 (2d Cir.2001) (the trial court did not abuse its discretion in admitting expert testimony that plaintiffs were suffering from lead poisoning).
Indeed, the most cherished of scientific “truths” are the subject of constant refinement and are frequently overturned by subsequent science. For instance, the 42-year consensus that DNA alone determines heredity was later “dethroned as a universal principle, albeit after the 1994 article by Black et al. was published.” Id. at 335. In fact, simultaneously accepted scientific principles are sometimes incompatible, and thus, might fare badly under a strict Daubert application.
Imagine Euclid testifying in a modern day Daubert proceeding: ‘Professor Euclid, I understand that one of your postulates is that parallel lines do not meet at infinity. Can you prove this to be true? Have you ever tested this? Isn’t it also true that Professor Einstein has proven that your geometry doesn’t work in the presence of gravity?’
Id. at 335 n. 42.
While the district court must necessarily draw lines, we must use caution in demanding the type of finality from science that we have come to expect in law. This is especially true when considering cases of newer scientific studies. It seems to me an overly harsh test at the admissibility level to insist upon testimony with no “gaps”, when the science itself may be incapable of absolute proof. Do malfeasing defendants get a free pass on the first few victims because there is not yet a sufficient sample set to create scientific studies with no discernable gaps? Do we tell the early victims, “I’m sorry, you had the misfortune of getting sick too soon”, and send them home?
The fact that scientists have not reached consensus regarding medical causation does not render reliance on a scientist’s theory improper expert testimony, particularly when, as in this case, the expert is relying on studies that appear to have been conducted using standard methodology. Rather, those differences should go to the weight that a jury should give an expert’s testimony. See Best v. Lowe’s Home Centers, Inc., 563 F.3d 171, 182 (6th Cir.2009) (finding that “admissibility under 702 does not require perfect methodology.... Any weakness in [a “competent, intellectually rigorous physician’s”] methodology [“in identifying the most likely cause of the plaintiffs injury”] will affect the weight that his opinion is given at trial, but not its threshold admissibility.”). In cases where the state of scientific consensus is difficult to determine, we must defer to the district court. The district court has the distinct advantage of having heard all the experts testify and can weigh the reliability of a given expert’s testimony against others more easily than we can. Our valuations of complicated medical expert issues such as these are made out of context and are therefore more likely to suffer flaws.
*685 Because Dr. Carlini relied on scientific methodology used by other experts in his field, see infra at 28, I do not believe that the district court abused its discretion in admitting his testimony. The district court’s determination that Dr. Carlini’s methodology was sufficiently reliable was certainly not clearly erroneous, so the testimony was admissible. What weight to grant his testimony was a question for the jury, not an appellate court sitting far removed from the trial. Because the majority has not demonstrated that the district court abused its discretion, it errs in reversing the district court’s decision.
IV.
For the reasons above, I respectfully dissent.

. Idiopathic disease are those for which there is no known cause — although Dr. Gregory House may provide the better definition: "Idiopathic, from the Latin meaning we’re idiots 'cause we can't figure out what’s causing it." House: Role Model (Fox television broadcast Apr. 12, 2005).

. We must evaluate Dr. Carlini's testimony in light of the science available to him at the time. Any findings — positive or negative— regarding the causal connection between manganese and Parkinson's disease made since that time are irrelevant for this analysis. It is clear that he was referring to a then-ongoing debate regarding the causal connection between manganese exposure and Parkinson’s Disease. See Murry M. Finkelstein, Michael Jerett, A Study of the Relationships between Parkinson's Disease and Markers of Traffic-Derived and Environmental Manganese Air Pollution in Two Canadian Cities, 104 Envtl. Res 420-432 (2007); Link Found Between Parkinson’s Disease Genes and Manganese Poisoning, Sci. Daily (Feb. 2, 2009), available at http://www.sciencedaily.com/releases/ 2009/02/090201141559.htm (last accessed Aug. 17, 2010).

. A quick internet search of scientific studies published in 2007 shows that a considerable number of studies existed at the time, attempting to establish, with varying degrees of success, that manganese exposure among welders could cause Parkinson's Disease.