*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SHELLY SIGLER,

       *Plaintiff-Appellant,*

    *v.*

AMERICAN HONDA MOTOR COMPANY,

       *Defendant-Appellee.*

No. 07-5471

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 05-00296—Curtis L. Collier, Chief District Judge.

Argued: February 1, 2008

Decided and Filed: July 8, 2008

Before: MOORE, CLAY, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Douglas S. Hamill, BURNETTE, DOBSON & PINCHAK, Chattanooga, Tennessee, for Appellant. Linda J. Hamilton Mowles, LEWIS, KING, KRIEG & WALDROP, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Douglas S. Hamill, Steven F. Dobson, BURNETTE, DOBSON & PINCHAK, Chattanooga, Tennessee, for Appellant. Linda J. Hamilton Mowles, LEWIS, KING, KRIEG & WALDROP, Knoxville, Tennessee, for Appellee.

    MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. ROGERS, J. (pp. 16-17), delivered a separate dissenting opinion.

---

## OPINION

---

    KAREN NELSON MOORE, Circuit Judge. In this diversity-of-citizenship lawsuit arising under the Tennessee Products Liability Act ("TPLA"), the district court granted summary judgment to Defendant-Appellee American Honda Motor Company ("Honda") after considering several unsworn letters from various experts for Honda. Because our case law clearly prohibits considering such materials, and because Plaintiff-Appellant Shelly Sigler ("Sigler") presented sufficient evidence to establish the existence of genuine issues of material fact regarding whether the airbag in her vehicle was defective and caused her injuries, we **REVERSE** the district court's judgment and **REMAND** to the district court for further proceedings consistent with this opinion.

1

# I. BACKGROUND

On September 23, 2004, Sigler was involved in a single-car accident while traveling northbound on Interstate 75 in Bradley County, Tennessee. According to Sigler's recollection and an affidavit filed by Terry Williams, a motorist who was driving his car seventy-five to one hundred yards behind Sigler, Sigler was driving at approximately seventy miles per hour immediately prior to the accident. J.A. at 132 (Williams Decl.); J.A. at 266 (S. Sigler Dep. at 33). Sigler's vehicle, a 1999 Honda Accord EX (the "Accord"), then "veered off the road, drove down an embankment and through a small wire fence, and hit a tree." J.A. at 239 (Mem. to Order Granting Summ. J. ("Mem.") at 2). "The tree, approximately six inches in diameter, was uprooted by the collision." *Id.*; J.A. at 285-86 (D. Sigler Dep. at 25-26).[1] Williams's declaration states that when he saw Sigler's vehicle "suddenly veer off the roadway [he] did not see any brake lights or blinkers" and that "[t]he car then went down the embankment and into a clump of trees." J.A. at 132 (Williams Decl. at ¶ 5).[2] Sigler's Accord was a "certified pre-owned" vehicle equipped with a driver's side airbag, which did not deploy. J.A. at 239 (Mem. at 2); *see also* J.A. at 135-36 (Rogers Decl.). Evidence in the record indicates that the Accord's airbag should have deployed if the vehicle, when it collided with the tree, experienced a rapid deceleration from a speed of over fourteen, or possibly twenty-five, miles per hour. J.A. at 55 (Honda Supplemental Restraint System Brochure ("Honda Brochure") at 7); J.A. at 139 (Griffin Decl. at ¶ 9) (citing National Highway Traffic Safety Administration data).

Sigler "was unconscious at the time of the accident and in a semi-conscious state when she was transported to Bradley Memorial Hospital." J.A. at 239 (Mem. at 2). When Sigler arrived at the hospital, hospital records indicate that Sigler did not mention any pain or injury. J.A. at 150 (Bradley Memorial Hospital Emergency Dep't Treatment) ("PE anxious but denies injury or pain. Ø lac[erations] or abrasions noted."). Sigler does not recall the collision, or indeed anything after she entered the highway shortly before her loss of consciousness and accident. J.A. at 266-68 (Sigler Dep. at 33-35). The record contains photographs[3] depicting the damage sustained by the

---

[1] After oral argument, Sigler filed a motion to file a supplemental joint appendix to include pages from the deposition of her husband, Doyle Sigler, that had been submitted to the district court but that had been inadvertently omitted from the Joint Appendix. Honda did not oppose Sigler's motion, and we grant her request to supplement the Joint Appendix with materials that were part of the district court record. Our dissenting colleague reproduces a sizable portion of Doyle Sigler's deposition, including one statement that the tree "that actually stopped the car was—it was probably a good, if I had to guess, six inches or larger around." Dissenting Op. at 16 (quoting J.A. at 286). The dissent finds it "troubling that plaintiff's brief misleadingly referred to the tree as 'a six-inch diameter tree'" given that Mr. Sigler used the word "around," which the dissent takes to mean that Mr. Sigler was estimating the circumference of the tree to be six inches. Dissenting Op. at 17. Both the district court and the deposition questioner, however, appeared to understand Mr. Sigler's estimate as describing the thickness, or diameter, of the tree. *See* J.A. at 239 (Mem.) (referring to the tree as being "approximately six inches in diameter"); J.A. at 290 (D. Sigler Dep. at 48) ("Q: Was it—where was [the car] relative to the six-inch tree that you described being uprooted?").

[2] Frustratingly, the record lacks definitive information regarding the distance between the crash site and the interstate. In their reports, some of the experts mentioned reviewing a copy of the police accident report and referred to an officer's drawing of the accident scene and a DVD containing video footage of the accident site, *see* J.A. at 139 (Griffin Decl. at ¶ 8); J.A. at 42 (Griffin Report at 2), but counsel confirmed at oral argument that the accident report, drawing, and video footage are not part of the record. In any event, the declaration submitted by Terry Williams, the eye-witness motorist who was driving behind Sigler on the interstate, gives rise to the inference that Sigler's vehicle remained in view throughout the incident. *See* J.A. at 132 (Williams Decl. at ¶ 5) ("I observed Mrs. Sigler's vehicle suddenly veer off the roadway. I did not see any brake lights or blinkers. The car then went down the embankment and into a clump of trees.").

[3] After oral argument, Sigler submitted a letter with an attached photocopy of the photograph that appears at page forty-four of the Joint Appendix. Sigler asserted that, unlike the degraded-quality version of the photograph that appeared in the Joint Appendix, the attached version of the photograph is of the same quality as the version originally submitted to the district court. Honda did not oppose Sigler's letter, and we grant Sigler's request to substitute the

Accord in the accident, J.A. at 44-46, and Sigler's insurance carrier "declared the vehicle a total loss due to frontal damage and paid [the Siglers] a total of $11,109.25" on their claim, J.A. at 143 (Sigler Decl. at ¶ 5).

According to Sigler and her husband, Doyle Sigler, on the day following the accident Sigler had developed a quarter-sized bruise above her left eye. J.A. at 262 (D. Sigler Dep. at 23); J.A. at 239 (Mem. at 2) (citing deposition testimony). Sigler then "developed severe headaches, dizziness and neck soreness (which she did not experience before the accident), which caused her to return to the hospital a week after the accident. [Sigler] admits to experiencing a 'possible seizure' prior to the accident, but alleges that since the accident, she has been experiencing seizures of aggravated duration and intensity." J.A. at 239 (Mem. at 2) (internal citations omitted); *see also* J.A. at 157 (Heisser Decl. at ¶ 4) (referring to Sigler's "preexisting seizure disorder"). Sigler claims that "[d]ue to these seizures, [she] cannot drive, had to discontinue nursing school, and is limited in her daily functioning." J.A. at 239 (Mem. at 2). Sigler also claims that her symptoms resulted from a second collision during her accident and that a deployed airbag would have prevented such a second collision. J.A. at 112-13 (Resp. to Honda's Mot. for Summ. J. at 3-4) (citing Sigler Dep. at 59 (J.A. at 276)); *see also* Appellant Br. at 28-30.

In September 2005, Sigler filed this lawsuit in Tennessee state court, and in October 2005, Honda removed the lawsuit to the U.S. District Court for the Eastern District of Tennessee. On January 31, 2007, Honda filed a motion for summary judgment as well as a motion in limine to exclude the testimony of Sigler's expert Jacob B. Griffin, III ("Griffin").

Sigler filed a response to the motion in limine and a response to the motion for summary judgment. Honda then filed a motion in limine to exclude the testimony of Sigler's experts Danny Bryant and Dr. Randy Heisser ("Dr. Heisser"), to which Sigler filed a response, and Honda then filed replies to all three of Sigler's responses. No hearings on any of the evidentiary motions were scheduled or held.

On March 30, 2007, the district court entered a Memorandum Opinion and Order granting Honda's motion for summary judgment and granting Honda's motion in limine to exclude the testimony of Griffin. Although the district court's Order did not specifically rule on the motion to exclude the testimony of Bryant and Heisser, as discussed below it appears that the district court implicitly ruled Heisser's testimony inadmissible.[4] *See infra*, Part II.B.4. Sigler timely filed a Notice of Appeal on April 5, 2007.

On June 29, 2007, Sigler filed in our court a motion titled "Motion of Plaintiff-Appellant Shelly Sigler to Have the Court Consider the Medical Record of Dr. David Adams Dated October 5, 2004." Honda filed a Response on July 25, 2007.

## II. ANALYSIS

Evidentiary questions abound in this appeal. We will consider first Sigler's motion filed in our court and then the district court's evidentiary rulings before analyzing the district court's decision to grant Honda's motion for summary judgment.

---

attached version of the photograph for the degraded-quality photocopy that appeared in the Joint Appendix.

[4] In her argument to the district court, Sigler stated that she never intended to call Bryant as a witness and that Honda's motion to exclude Bryant's testimony was moot. J.A. at 214 (Pl.'s Resp. to Mot. in Limine to Exclude Bryant and Heisser Testimony at 4).

## A.  Sigler's Motion to Consider Medical Records

On June 29, 2007, Sigler filed a motion titled "Motion of Plaintiff-Appellant Shelly Sigler to Have the Court Consider the Medical Record of Dr. David Adams Dated October 5, 2004." Sigler's counsel claim that they first became aware of the medical record on March 26, 2007, and the district court docket sheet reflects that on March 27, 2007, Sigler filed a supplement to her exhibit list and her witness list.  R. Nos. 47 and 48, No. 1:05-cv-00296.  On March 30, 2007, the district court granted Honda's motion for summary judgment without considering this medical record.

Sigler offers two bases upon which we could grant her motion:  first, that we may take judicial notice of certain facts under Rule 201 of the Federal Rules of Evidence; and second, that we have an inherent equitable power to supplement the record with material not reviewed by the district court.  Mot. to Consider Medical Records at 3 (citing *United States v. Murdock*, 398 F.3d 491, 499 (6th Cir. 2005)).  We deny her motion on both grounds.

Federal Rule of Evidence 201 governs judicial notice of "adjudicative facts."  Fed. R. Evid. 201(a).  Rule 201(b) provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  The evidence that Sigler seeks to add to the record—medical notations from Sigler's post-accident visit to her treating physician—clearly does not fall within either category.

Sigler contends that the Seventh Circuit's decision in *Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003), supports granting her motion, but *Denius* in fact demonstrates why her motion is inappropriate under Rule 201.  Sigler describes *Denius* as holding "that the trial court had abused its discretion in refusing to take judicial notice of medical records contained on the National Personnel Record Center's website."  Pl.'s Mot. at 8.  In fact, the Seventh Circuit in *Denius* permitted judicial notice only "to note that the NPRC [National Personnel Records Center] and the VA [Department of Veterans Affairs] *do in fact maintain* medical records of retired United States military personnel," but the court did *not* permit judicial notice of the *contents* of any medical records, as Sigler requests that we do.  *Denius*, 330 F.3d at 926 (emphasis added).  *Denius* involved a lawsuit brought under 42 U.S.C. § 1983 by an employee against a state-government employer for requiring the employee "to authorize the release of a broad range of personal information as a condition of continued employment," and the issue before the court was whether the state employer's authorization form, which demanded that employees consent to the release of records maintained by the NPRC, among other agencies, extended to medical records.  *Id.* at 921, 921-27.  Although the plaintiff, a retired Air Force technical sergeant, "offered no evidence about the nature of the NPRC," the Seventh Circuit held that "the fact that the NPRC maintains medical records of military personnel is appropriate for judicial notice because it is not subject to reasonable dispute." *Id.* at 925, 926.  To take judicial notice of the medical notations made by Sigler's treating physician bears little resemblance to taking notice of "a factual issue[, such as the role of the NPRC,] that, according to information readily available in the public domain, cannot be reasonably disputed." *Id.* at 927.  Accordingly, Rule 201 offers Sigler no support.

Sigler also argues that *United States v. Murdock*, 398 F.3d 491 (6th Cir. 2005), supports the proposition that "a court of appeals has discretionary authority to supplement the record with

material not reviewed by the district court in special circumstances."[5] *Id.* at 499.  In *Murdock*, we listed "several factors to be considered in deciding whether to exercise that discretion," including

> 1) whether proper resolution of the case was beyond any dispute, 2) whether it would be inefficient to remand to the district court for review of additional facts, 3) whether the opposing party had notice of the existence of the disputed evidence, and 4) whether the case is before the court on a habeas corpus claim, because federal appellate judges have "unique powers" in that context.

*Id.* at 500 (quoting *Dickerson v. Alabama*, 667 F.2d 1364, 1367-68 (11th Cir. 1982)).  We also cited the Third Circuit's opinion in *In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*, 913 F.2d 89 (3d Cir. 1990), which listed a similar set of factors including "whether remanding the case to the district court for consideration of the additional material would be contrary to the interests of justice and the efficient use of judicial resources."  *Id.* at 97.

We hold that Sigler's motion fails these tests.  Sigler produced the information at an extremely late stage, offered essentially no explanation for the delay, and should have uncovered the information long before discovery had closed.  Sigler's explanation for the delay is that she has suffered memory loss following the accident and only recently learned that she had visited her treating physician Dr. Adams on October 5, 2004, when she received an overdue billing notice from the office in late March 2007.  In her motion, Sigler notes that Dr. Adams treated her on the day of her accident at Bradley Memorial Hospital, Pl.'s Mot. at 6; *see also* J.A. 148-50 (Bradley Memorial Hospital Records), and given that Sigler's condition and the effects of her accident is the central issue in this lawsuit, Sigler had every reason to request all relevant medical records from physicians who treated her, and to do so well before the close of the discovery period.  Permitting her to supplement the record on appeal with information that she could have easily obtained much earlier would not advance the interests of justice and would not further efficient use of judicial resources.  *See Capital Cities*, 913 F.2d at 97.  Our decision denying Sigler's motion in our court does not, however, prevent the district court on remand from reaching its own decision regarding this medical record.

## B.  The District Court's Evidentiary Rulings

Sigler attacks three of the district court's evidentiary rulings, contending first that the district court erred in granting Honda's motion in limine regarding her expert witness Griffin; second, that it erred in relying upon unsworn letters containing hearsay evidence that Honda submitted; and third, that it erred in ruling that the evidence of her expert witness Dr. Heisser was unreliable and inadmissible.  Addressing each of her arguments in turn, we affirm the district court's decision to grant Honda's motion in limine as to Griffin.  We hold, however, that the district court improperly relied on hearsay evidence in granting Honda's motion for summary judgment, and we reverse the district court's ruling as to Dr. Heisser.

### 1.  Standard of Review

"This court reviews the district court's decision to exclude the testimony of [a party's] expert witnesses . . . for abuse of discretion."  *Pride v. BIC Corp.*, 218 F.3d 566, 575 (6th Cir. 2000).  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v.*

---

[5] To the extent that Sigler also seeks to supplement the record under Rule 10(e)(2) of the Federal Rules of Appellate Procedure, our decision in *Murdock* explained that "the purpose of Rule 10(e)(2) is to permit the court 'to correct omissions from or misstatements in the record for appeal, not to introduce new evidence in the court of appeals.'"  *Murdock*, 398 F.3d at 500 (quoting *United States v. Smith*, 344 F.3d 479, 486 (6th Cir. 2003)).  Accordingly, Rule 10(e)(2) provides no support for Sigler's motion.

*Carmichael*, 526 U.S. 137 (1999), the Supreme Court set forth the standard for admissibility of expert testimony under Federal Rule of Evidence 702. The Court's "requirement that 'any and all scientific testimony or evidence admitted [be] not only relevant, but reliable,' 'entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907 (6th Cir. 2004) (quoting *Daubert*, 509 U.S. at 589, 592-93) (internal citation omitted). "In short, under *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of" relevant issues. *Pride*, 218 F.3d at 578.

## 2. The Exclusion of Griffin's Testimony

Sigler's expert Griffin provided evidence via a report, J.A. at 41-42, and a sworn declaration, J.A. at 138-40, regarding the speed at which the Accord likely struck the tree and the possible cause for the failure of the Accord's airbag to deploy given Griffin's opinion that the Accord was traveling at thirty to forty miles per hour when it collided with the tree. J.A. at 138-40 (Griffin Decl.). Griffin attested that he owns and operates two automobile sales and service facilities, performs "vehicle autopsies" for the Hamilton County District Attorney's Office, has served as an expert witness in civil litigation, and has twenty-six years of experience in repairing and diagnosing problems with automobiles. J.A. at 138-39. Honda's motion in limine argued that "Griffin is not qualified as an expert to give testimony regarding the speed of the Accord when it went off the roadway and struck the tree, nor to give testimony regarding any alleged defect and/or unreasonably dangerous condition of the Accord." J.A. at 21 (Mot. in Limine to Exclude Griffin at 2).

The district court granted Honda's motion in limine because "[n]othing in Griffin's resume, education, or training suggests he is qualified to offer an expert opinion on a defect in the Accord's airbag *without actually inspecting it*. Griffin's resume suggests he would have been admissible and well-qualified to perform an automobile autopsy per his typical practice." J.A. at 249 (Mem. at 12). The district court noted that "Griffin is clearly an expert mechanic, but his qualifications do not suggest he is an expert in physics, accident reconstruction, or airbag engineering." *Id.*

In part to respond to similar arguments that Honda advanced in its motion for summary judgment, Griffin's sworn declaration, which Sigler appended to her Response to Honda's Motion for Summary Judgment, revealed for the first time that Griffin's evaluation involved assistance from Danny Bryant, who "was formerly employed by the Virginia State Police" and who "has received a certification in accident reconstruction from the Transportation Safety Training Center at Virginia Commonwealth University." J.A. at 139 (Griffin Decl. at ¶ 7). The district court found that Griffin's reliance on Bryant's expertise only underscored the impropriety of Griffin's evidence as an expert on issues pertaining to accident reconstruction and potential defects in the airbag. The district court observed that "Griffin is not an accident reconstructionist—this is key—and may not testify as such" and also cited *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002), a case on which Sigler had relied. J.A. at 250 (Mem. at 13 n.5). In *Dura*, the Seventh Circuit explained that

> [a] theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if [the theoretical economist] lacked expertise in econometrics and the study raised questions that only an econometrician could answer. If it were apparent that the study was not cut and dried, the author would have to testify; he could not hide behind the theoretician.

*Dura*, 285 F.3d at 614.

Similarly, in this case, although Griffin appears to be an able mechanic, the substance of his evidence deals with estimating the speed at which Sigler's vehicle was traveling when it struck the tree, a matter of accident reconstruction. Griffin's report and declaration also offered an opinion as to why the airbag failed to deploy, but Griffin's "usual practice" is to examine the vehicle, and he was unable to inspect Sigler's Accord because Sigler's insurance company had already salvaged the vehicle. J.A. at 247, 249 (Mem. at 10 n.4, 12). Griffin's evidence thus pertained to accident reconstruction, an area in which he lacked expertise, and to analyzing an automobile after an accident, an area in which Griffin *does* have expertise, but his method involves physically examining the vehicle, which did not occur in this case. We hold, therefore, that the district court did not abuse its discretion in granting Honda's motion in limine to exclude Griffin from offering evidence on the subject of accident reconstruction and on the subject of potential defects in the Accord.

### 3. The District Court's Reliance on Honda's Unsworn Expert Statements

Sigler argues that the district court improperly relied upon three expert reports that Honda attached to its Motion for Summary Judgment. Appellant Br. at 30-35; *see also* Appellant Reply Br. at 6-8. The reports in question were prepared by Dr. Berta Bergia ("Bergia"), J.A. at 70, Dr. Charles E. Bain ("Bain"), J.A. at 71-75, and Alfred E. Kirkland ("Kirkland"), J.A. at 76-77. The district court's opinion contained substantial discussion of these reports and clearly relied on them. J.A. at 252 (Mem. at 15 n.6); J.A. at 254 (Mem. at 17); J.A. at 256 (Mem. at 19). All three reports, however, were not sworn statements, and Sigler argues that, under Federal Rule of Civil Procedure 56, the district court should not have considered them. *See also Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006) ("Although the district court relied on both the Bukowski Report and the Quillen Affidavit, the Bukowski Report is unsworn and thus is hearsay, which may not be considered on a motion for summary judgment.").

In response to Sigler's arguments that the district court improperly considered these three expert reports, Honda argues that "[t]he first time [Sigler] objected to these reports is in the appellant's brief on appeal" and "submits that the issue of [Honda's] use of these reports has been waived by [Sigler] inasmuch as her objection was not brought to the trial court's attention." Appellee Br. at 47, 50. Honda's assertions, however, are simply incorrect. Sigler repeatedly objected in the district court to these three expert reports. In her Response to Honda's Motion for Summary Judgment, Sigler described Bergia's opinion as "inadmissible hearsay." J.A. at 123 (Pl.'s Resp. to Mot. for Summ. J. at 14). Sigler also noted that Honda's motion "cite[d] to two hearsay reports from Alfred Kirkland and Charles Bain" and argued that "[t]hese reports are clearly hearsay. Neither Mr. Kirkland nor Dr. Bain has submitted a sworn declaration or affidavit. Thus, their expert reports are inadmissible." J.A. at 125-26 (Pl.'s Resp. to Mot. for Summ. J. at 15-16). Furthermore, in her Response to Honda's Motion in Limine to Exclude the Testimony of Dr. Heisser, Sigler again referred to the "hearsay report of Berta Bergia, M.D." J.A. at 213 (Pl.'s Resp. to Mot. in Limine to Exclude Heisser Testimony at 3).

Even construing Honda's argument as contending that Sigler forfeited her evidentiary objections because she failed to object to the hearsay evidence by filing a motion in limine, as opposed to simply raising an objection in her motion in opposition to summary judgment, Honda's argument fails. As Sigler argues in her Reply Brief, "to the extent that [Honda] implies in its argument that [Sigler's] hearsay objections were not raised by proper procedure" that argument lacks merit because Honda has not pointed to any authority setting forth the manner in which a party must object to hearsay evidence. Appellant Reply Br. at 8. In arguing that Sigler has forfeited her evidentiary claim by failing to object in the district court, Honda quotes at length from an opinion from the Northern District of Ohio, but that opinion's language does *not* indicate that any particular procedure is required for objecting. *See Gault v. Zellerbach*, 981 F. Supp. 533, 536 (N.D. Ohio 1997) ("The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver."). Furthermore, our sister circuits have held that objecting in summary

judgment papers to such improper evidence suffices to preserve the issue on appeal. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("Fraser would have us conclude that the Bank waived its hearsay objection to the diary. However, the Bank's objection was clear, specific, and timely made to the district court in its reply motion for summary judgment. The Bank's evidentiary objection was preserved."); *Taylor v. Principi*, 141 F. App'x 705, 708 (10th Cir. 2005) (unpublished) ("In his motion for summary judgment, defendant timely objected to Ms. Taylor's failure to properly authenticate the documents in her affidavit.").

We hold that the district court improperly considered Honda's unsworn, hearsay evidence in deciding to grant Honda's motion for summary judgment. *Pack*, 434 F.3d at 815. Further, we hold that Sigler adequately raised the issue below by objecting multiple times to this hearsay evidence in her responses to Honda's motion for summary judgment and motion in limine.

### 4. The Exclusion of Dr. Heisser's Testimony

As an initial matter, although Sigler's brief asserts that the "trial court erred in excluding the expert testimony of Dr. Randy Heisser," Appellant Br. at 26, the district court's Order mentions only that the court granted Honda's motion for summary judgment and its motion in limine regarding Griffin. J.A. at 258 (Order). The Order does not in fact state any disposition of Honda's motion in limine regarding Dr. Heisser. *Id.* Nonetheless, the district court's memorandum opinion discussed Dr. Heisser's declaration, stating that "[t]he Court agrees with [Honda's] argument that there is no evidence in the record to support the assumptions upon which Heisser bases his opinion (there is, specifically, no evidence as to the Accord's speed at the time of the collision)." J.A. at 255 (Mem. at 18). The court concluded that Heisser's "testimony is irrelevant and unreliable under Fed. R. Evid. 702 as interpreted by *Daubert* and its progeny." J.A. at 255-56 (Mem. at 18-19). From this language, it appears that the district court viewed Dr. Heisser's evidence as inadmissible, even if the court failed to issue such a ruling in its order, and we will assess Sigler's argument as though the district court had formally excluded Heisser's evidence.

In excluding Dr. Heisser's evidence, the district court clearly abused its discretion because the factual record contradicts the court's analysis, which was infected by reliance on the unsworn materials that Honda submitted. The critical portion of Dr. Heisser's declaration states that

> [a]ssuming that Mrs. Sigler's vehicle was traveling at least 20 miles per hour when it struck the tree, and further assuming that Mrs. Sigler's head struck the interior of the vehicle during the collision, within a reasonable degree of medical certainty, such trauma to the head more than likely aggravated or exacerbated her preexisting seizure disorder.

J.A. at 157 (Dr. Heisser Decl. at ¶ 4). In describing Dr. Heisser's evidence as "irrelevant and unreliable," the district court stated that, having excluded Griffin's evidence, "there is no evidence in the record to support the assumptions upon which Heisser bases his opinion (there is, specifically, no evidence as to the Accord's speed at the time of the collision)." J.A. at 256, 255 (Mem. at 19, 18). The district court's analysis on this point relied upon the hearsay expert reports submitted by Honda, as the court observed that Honda "has offered an expert rebuttal averring that a second collision would not have occurred under the speed, delta-V, and conditions of the accident" such that "Heisser's declaration would not aid the jury." J.A. at 256 (Mem. at 19) (citing Kirkland Letter, J.A. at 76-77).

Contrary to the district court's assertion, the record *does* contain evidence to support Heisser's assumptions—and, of course, the district court should not have considered the unsworn Kirkland letter. Specifically, Sigler's deposition and Williams's Declaration provided evidence that Sigler was driving approximately seventy miles an hour before the Accord veered off the road, and

Williams testified that he did not see any brake lights or blinkers on Sigler's vehicle. J.A. at 132 (Williams Decl. at ¶ 5); J.A. at 266 (S. Sigler Dep. at 33). Although it is unclear how far the car traveled after leaving the highway, the declarations of Williams and Alton Rogers, the member of the Tennessee State Highway Patrol who responded to the accident, indicate that the car traveled down an embankment and through a small fence before going into a clump of trees. J.A. at 132-36 (Williams and Rogers Decls.). The record therefore contains evidence that the Accord was traveling at seventy miles per hour shortly before the accident, that its brakes were not activated, and that it traveled downhill before striking and uprooting the tree. Given that Honda moved for summary judgment, we must draw all reasonable inferences from the evidence in favor of Sigler, and the available evidence permits an inference that the Accord was still traveling at a relatively high rate of speed—at least above twenty miles per hour as Dr. Heisser assumed—when it collided with the tree. Further, although Sigler was unconscious at the time of the accident and no witness saw the impact, whether Sigler's head struck the interior of the car is a disputed issue of material fact given the testimony from Sigler and her husband that she developed a bruise on her head the day after the accident. J.A. at 262 (D. Sigler Dep. at 23); J.A. at 239 (Mem. at 2) (citing deposition testimony).

Dr. Heisser's declaration could assist the jury in finding the facts, and the district court abused its discretion in excluding Dr. Heisser's evidence. Neither Honda nor the district court offered any reason to question the qualifications or reliability of Dr. Heisser as an expert medical witness; rather, his testimony was excluded for relying on assumptions that the district court found were unwarranted, in light of inadmissible evidence that the court should not have considered. As a result, given the remaining admissible evidence, a reasonable jury might well choose to believe that the circumstantial evidence demonstrates that the Accord was more likely than not traveling at a speed in excess of twenty miles per hour when it collided with and uprooted the tree. A reasonable jury might also believe the Siglers and find that, as a result of the airbag's failure to deploy, a second collision occurred and caused Sigler's bruise, in which case Dr. Heisser's expert opinion— that such a second collision and resulting head trauma is likely to have exacerbated Sigler's preexisting seizure condition—is highly relevant.

We therefore hold that the district court abused its discretion in excluding Dr. Heisser's evidence.

## C. Summary Judgment

### 1. Standard of Review

"We review de novo a district court's grant of summary judgment." *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "In deciding an appeal of a grant of summary judgment, we view the evidence and draw all reasonable inferences in favor of [Sigler], the non-moving party." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The moving party bears the burden of showing the absence of any genuine issues of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). Once the movant has satisfied its burden, the nonmoving party must "come forward with evidence showing that there is a genuine issue for trial." *Id.* The nonmovant must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. We must "assess the proof to determine whether there is a genuine need for trial," and "[t]he proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiff." *Weigel v. Baptist*

*Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

### 2.  Whether the District Court Appropriately Granted Summary Judgment

The district offered two grounds for its decision to grant Honda's motion for summary judgment. First, the court found that Sigler "failed to circumstantially show a defect in the Accord's airbag because [Sigler] has offered insufficient evidence to suggest that a defect is the 'more probable hypothesis' as to why the airbag did not deploy." J.A. at 244 (Mem. at 7) (quoting *Motley v. Fluid Power of Memphis, Inc.*, 640 S.W.2d 222, 225 (Tenn. Ct. App. 1982)). Second, the district court also granted Honda's motion for summary judgment because the court "conclude[d that Sigler] has failed to establish the element of proximate cause" in that Sigler "offered no evidence connecting" the alleged collision she experienced inside the vehicle after the Accord struck the tree "to her alleged injuries, and most importantly, to her *enhanced injuries*." J.A. at 252 (Mem. at 15). Given our holding that the district court improperly considered materials that formed a substantial basis for its decision to grant Honda's motion for summary judgment, we hold that, after examining the remaining evidence in the case and drawing all reasonable inferences in favor of Sigler, neither ground supports the district court's decision to grant summary judgment for Honda.

### a.    Whether a Genuine Issue of Material Fact Exists Regarding a Defect in the Accord's Airbag

As the district court noted, under Tennessee law, establishing a prima facie products-liability claim requires that "the plaintiff must show:  (1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the plaintiff's injury was proximately caused by the defective product." J.A. at 242 (Mem. at 5) (citing *King v. Danek Med.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000)). The parties do not contest the second element, and in this section we consider the first element.

As the district court noted, "[a] plaintiff may demonstrate that a product was defective or unreasonably dangerous through direct evidence, circumstantial evidence, or a combination." *Id.* Tennessee law provides two tests for determining whether a product is unreasonably dangerous. Tenn. Code Ann. § 29-28-102(8) (Tennessee Products Liability Act ("TPLA")).[6] Under the "consumer expectation test," bringing a successful claim "simply requires a showing that the product's performance was below reasonable minimum safety expectations of the ordinary consumer having ordinary, 'common' knowledge as to its characteristics." *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn. 2001) (approving use of the consumer-expectation test in a case involving an allegedly defective seat belt).[7] Further, "'[t]he general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury.'" *Id.* at 805 (quoting *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1427 (E.D. Tenn. 1991)).

---

[6] The statute defines "[u]nreasonably dangerous" as meaning that:

> a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8).

[7] The second test is the "prudent manufacturer test," and because the two tests "are not exclusive of one another . . . either or both of these tests are applicable to cases where the product is alleged to be unreasonably dangerous." *Jackson*, 60 S.W.3d at 806. Unlike the consumer-expectation test, under the prudent-manufacturer test "expert testimony about the prudence of the decision to market would be essential." *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527, 531 (Tenn. 1996).

Honda vigorously contests that the consumer-expectation test is the proper test to apply in this case, Appellee Br. at 22-28, but its argument is unpersuasive. Although the Tennessee Supreme Court in *Jackson* approved the consumer-expectation test in a case involving seat belts, Honda relies heavily on *Irion v. Sun Lighting, Inc.*, No. M2002-00766-COA-R3-CV, 2004 WL 746823 (Tenn. Ct. App. 2004), an unpublished decision issued by the Tennessee Court of Appeals after *Jackson* that quotes *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527 (Tenn. 1996), a Tennessee Supreme Court case predating *Jackson* and that *Jackson* itself analyzed. *Irion* quotes language from *Ray* stating that the second test established by the TPLA, the prudent-manufacturer test

> is applicable to more complex products . . . about which an average consumer would have no basis for forming any expectation. "For example, ordinary consumers would have a basis for expectation about the safety of a can opener or coffee pot, but, perhaps, not about the safety of a fuel-injection engine or an air bag."

*Irion*, 2004 WL 746823, at *5 (quoting *BIC*, 925 S.W.2d at 531) (internal citation omitted). Honda also cites our decision in *Brown v. Raymond Corp.*, 432 F.3d 640 (6th Cir. 2005), in which we quoted *Irion* in holding that the prudent-manufacturer test applied in a case involving an industrial-forklift accident.

The district court "decline[d] to rule on which test is most proper," because it found that, even if the consumer-expectation test applied, Sigler failed to meet it. J.A. at 244-45 (Mem. at 7-8 & n.1). Nonetheless, the district court did state that "[i]t seems to the Court that the prudent manufacturer test applies in design-defect cases, and is much less applicable here, in what appears to be a manufacturing-defect claim." J.A. at 244-45 (Mem. at 7-8 & n.1) (citing Robert P. Murrian, *Tennessee's Prudent Manufacturer Test*, 67 Tenn. L. Rev. 307, 313 (2000)). Indeed, in contrast to Sigler's manufacturing-defect claim, the plaintiffs' lawsuits in both *Brown* and *Irion* involved design-defect or product-warning claims. *Brown*, 432 F.3d at 641-42, 649 (involving claims that forklift wheel well and brakes were defectively designed and claim of failure to warn); *Irion*, 2004 WL 746823, at *1 (alleging that a "lamp was defectively designed because it did not have a protective guard over the bulb to prevent combustibles from contacting the bulb which generated extreme heat").

Considering the Tennessee Supreme Court's opinion in *Jackson* along with our opinion in *Brown* makes clear that the consumer-expectation test applies to Sigler's claim. In *Jackson*, the Tennessee Supreme Court clearly stated that "we conclude that the consumer expectation test *is applicable to any* products liability case in which a party seeks to establish that a product is unreasonably dangerous under Tennessee law." *Jackson*, 60 S.W.3d at 806 (emphasis added). The Tennessee Supreme Court did recognize that "it may be difficult for plaintiffs in cases involving highly complex products to establish that the product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer, even though the consumer expectation test may, technically, apply." *Id.*

In *Brown*, we considered a plaintiff's design-defect and failure-to-warn claims and "agree[d] with the district court that a forklift is a complex machine beyond the purview of the ordinary consumer and that [the plaintiff] was therefore obligated to provide expert testimony in order to survive a motion for summary judgment." *Brown*, 432 F.3d at 646. In *Brown*, we thus applied the prudent-manufacturer test simply because the plaintiff's design-defect and failure-to-warn claims regarding a forklift presented a situation similar to that which the Tennessee Supreme Court anticipated when it stated in *Jackson* that certain "cases involving highly complex products" would render meeting the consumer-expectation test "difficult" or essentially impossible, "even though the consumer expectation test may, technically, apply" to the lawsuit. *Jackson*, 60 S.W.3d at 806. Indeed, in *Brown* we observed that the "allegation that a forklift was defectively designed is precisely the type of 'situation' in which the 'ordinary consumer' would not have 'an expectation

regarding the safety of the product.'" *Brown*, 432 F.3d at 644 (quoting *Irion*, 2004 WL 746823, at *6); *see also id.* at 649 (concluding that, as to the plaintiff's "defective-brakes claim, we also find that the district court correctly ruled that Brown had made *design-defect* allegations that required expert testimony to sustain them") (emphasis added). We made a similar observation in *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 427 (6th Cir. 2007), a case that involved a "boom truck crane" and allegations of defective design and inadequate warnings. We noted that "[b]oth parties recognize that the prudent-manufacturer test is best applied to this case because it involves 'establishing the unreasonable dangerousness of a complex product about which an ordinary consumer has no reasonable expectation.'" *Id.* at 428-29 (quoting *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527, 531 (Tenn. 1996)).

Sigler's claim contrasts markedly to the plaintiffs' claims in *Brown* and *Johnson*—which both involved allegations that complex pieces of industrial machinery suffered from defective designs and lacked adequate warnings—and this contrast demonstrates why the consumer-expectation test applies to her lawsuit. Sigler's claim involves an airbag, a federally required component of new automobiles, 49 U.S.C. § 30127, and alleges only that the particular airbag in her vehicle was defective and failed to deploy in what she alleges was a high-speed collision that uprooted a tree. Sigler submitted a sworn affidavit stating her expectation that the airbag would deploy in an accident like the high-speed crash that she alleges occurred, J.A. at 142-43 (Sigler Aff. at ¶ 3), and Honda's own brochure created an expectation that an airbag should deploy in a high-speed, frontal crash like that which Sigler alleged, J.A. at 55 (Honda Brochure at 7) (stating that "when a car traveling 30 mph crashes head-on into a parked vehicle or other solid, stationary object, its speed will change very quickly" and that the vehicle's "sensors will detect the rapid decrease in speed and immediately signal the airbags to deploy"). The Tennessee Supreme Court stated that satisfying the consumer-expectation test "entails a showing by the plaintiff that . . . familiarity of the product's performance by consumers is sufficient to allow consumers to form reasonable expectations of the product's safety." *Jackson*, 60 S.W.3d at 806. Sigler offered evidence that an airbag is such a familiar product and that consumers—and, indeed, manufacturers like Honda—have expectations about the product's performance and safety. As a result, we hold that the consumer-expectation test is an acceptable standard by which to evaluate Sigler's claim.

Analyzing Sigler's claim under the consumer-expectation test—and without considering Honda's hearsay expert reports— we hold that the district court inappropriately granted summary judgment on the ground that Sigler failed to present a genuine issue of material fact as to the existence of a defect in the airbag. Because none of Honda's hearsay expert reports should have been considered, the only evidence in the record regarding the nature of the accident is the circumstantial evidence that Sigler presented: that prior to her seizure she was driving at a speed of approximately seventy miles an hour; that the Accord suddenly veered off the road; that an eye witness did not see any brake lights; that the Accord collided with and uprooted a tree located some distance downhill from the Interstate; and that Sigler's insurance company declared the vehicle a "total loss" and paid the Siglers over $11,000 on their insurance claim, showing that the vehicle sustained significant damage and giving rise to an inference that her vehicle was traveling at a high speed when it collided with the tree.

Shorn of its expert reports concluding that the collision was a relatively low-speed accident, Honda has essentially no evidence to counter Sigler's circumstantial evidence that the Accord struck the tree at a high speed, in which case according to Honda's own brochure the airbag likely should have deployed. "Where a plaintiff is dependent upon circumstantial evidence [to prove a defect in a product], it is sufficient if he makes out the more probable hypothesis, and the evidence need not arise to that degree of certainty which would exclude every other reasonable conclusion." *Motley*, 640 S.W.2d at 225. Under this standard, Sigler's claim should survive summary judgment because the only evidence in the record, viewed according to our obligation to draw all reasonable inferences in her favor, supports her hypothesis that the airbag in her Accord was defective because her

accident more likely than not involved conditions in which the airbag should have deployed.[8]  In contrast, without its hearsay expert reports, no evidence supports Honda's alternative hypothesis that the airbag was not defective and should not have deployed because the Accord was traveling at a speed insufficiently great to cause rapid deceleration and deployment.

### b.   Whether a Genuine Issue of Material Fact Exists Regarding Sigler's Ability to Establish that the Allegedly Defective Airbag Caused her Injuries

The second ground on which the district court granted Honda's motion for summary judgment was that Sigler had "failed to establish the element of proximate cause." J.A. at 252 (Mem. at 15).  In light of our evidentiary rulings, particularly our conclusion that the district court improperly excluded Dr. Heisser's evidence, we hold that the district court erred in granting summary judgment to Honda on the basis that Sigler failed to establish the element of proximate cause.

In its discussion of causation, the district court noted that Sigler was "assert[ing] a 'crashworthiness' claim against [Honda]" and alleging that, due to the airbag's failure to deploy, "a 'second collision' [resulted] when her head struck the Accord's interior." *Id.*  Observing that Sigler had not alleged that Honda was responsible for the initial collision with the tree, the district court held that Sigler needed to "prove (1) how her injuries were enhanced by this second collision [caused by the airbag malfunction], or (2) how her injuries could have been avoided if the airbag had deployed." J.A. at 253 (Mem. at 16).  The court then stated that "[t]o this end, [Sigler] initially offered no evidence" and described Honda's arguments to this effect in its motion for summary judgment.  J.A. at 253-54 (Mem. at 16-17).  The district court noted that Honda cited *Smith v. General Motors Corp.*, 376 F. Supp. 2d 664, 667 (W.D. Va. 2005), for the proposition that, in cases involving complex injuries, "Tennessee law requires a plaintiff to produce expert medical testimony to establish the causal connection between the alleged defect and the plaintiff's injuries." J.A. at 254 (Mem. at 17) (internal quotation omitted).

In response to Honda's causation arguments, Sigler provided two replies. J.A. at 254 (Mem. at 17) (citing Sigler's Resp. to Mot. for Summ. J.).  First, Sigler argued that her injuries, such as "bruising, severe headaches, neck pain, and dizziness," are simple and routine such that Tennessee law does not require proof by expert testimony. *Id.*  We disagree with Sigler's argument on this point.  Sigler's condition appears primarily to involve an increase in the "frequency and magnitude" of seizures, and Sigler's brief describes her as suffering an average of "three grand mal seizures per month and three partial complex seizures per week." Appellant Br. at 10.  Based on that description, we do not believe that her injuries are of a simple and routine nature such that she need not present any expert testimony. *See Knoxville Optical Supply, Inc. v. Thomas*, No. 03A01-9207CV00267, 1993 WL 574, at *3 (Tenn. Ct. App. 1993) (unpublished) ("It has been implicitly recognized that causation of epileptic seizures is a matter for expert medical testimony by treating expert testimony as a link in the causal chain between a head injury and epileptic seizures.").

---

[8]  The dissent believes that summary judgment was "compelled" in this case because "[w]hen a car leaves a highway at 70 miles per hour and coasts for an uncertain distance to a stop in wet ground in a bunch of small trees, there is no way that a reasonable juror could conclude, without more, on a more-probable-than-not-basis, that the car was going over 14 miles per hour when it suddenly came to a stop." Dissenting Op. at 17.  As we note above in text, however, a reasonable juror *would* have something "more" on which to base her conclusion that the car was going over 14 miles per hour:  Sigler's insurance company declared the vehicle a "total loss" and paid the Siglers over $11,000 on their insurance claim. J.A. at 143 (Sigler Decl. at ¶ 5).  Further, when reviewing a grant of summary judgment, "[w]e must view the facts contained in the record and draw all inferences from the record in the light most favorable to the nonmoving party." *McClain v. NorthWest Cmty. Corrs. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 327 (6th Cir. 2006).  Speculation that Sigler's vehicle "coast[ed] for an uncertain distance to a stop in wet ground" runs contrary to our standard of review at this stage. Dissenting Op. at 17.

Sigler's second response to Honda's causation argument is more persuasive. Sigler filed the expert report and sworn declaration of Dr. Heisser, who opined that "[a]ssuming that Mrs. Sigler's vehicle was traveling at least 20 miles per hour when it struck the tree, and further assuming that Mrs. Sigler's head struck the interior of the vehicle during the collision," he could state that "within a reasonable degree of medical certainty, such trauma to the head more than likely aggravated or exacerbated her preexisting seizure disorder." J.A. at 157 (Heisser Decl. at ¶ 4).

The district court's analysis of the causation issue was tainted by heavy reliance on the hearsay materials that Honda submitted. As discussed above, although it did not issue a formal order on this point, the district court appears to have excluded Dr. Heisser's evidence. Further, to the extent that the district court did consider Dr. Heisser's evidence, the court's consideration of Honda's hearsay evidence infected its analysis. After finding that Dr. Heisser's opinion was "irrelevant and unreliable" because of his assumptions regarding the speed at which the Accord was traveling upon impact, the district court nonetheless continued with an analysis purporting to explain why "[e]ven if the Court was to accept Heisser's conclusion, [Sigler] misses the point of her crashworthiness claim. [Sigler] argues she was injured as a result of her accident, but she fails to distinguish between the injuries attributable to colliding with a tree and the injuries attributable to the airbag's alleged malfunction." J.A. at 256 (Mem. at 19). Contending that Sigler "offers no competent reconstruction of the collision with the tree" aside from Sigler's "own circumstantial statement that she developed a bruise the day after the accident," the district court noted that Honda "has offered an expert rebuttal averring that a second collision would not have occurred" according to that expert's analysis of the accident conditions. *Id.* As we have explained, however, that expert's report was an unsworn letter, and the district court should not have considered it.

The district court also stated that "[p]rior to the declaration by Heisser, [Sigler] admitted no medical doctor had told her that hitting her head had complicated her seizure disorder" and observed that "[a]gain, [Honda] offered the evidence of two medical doctors that [Sigler's] injuries did not proximately result from a second collision, or even from the primary." *Id.* Again, as explained above, Honda's two medical experts offered only unsworn letters, and the district court should not have considered their opinions.

The district court concluded its opinion by listing three ways in which Sigler's evidence as to proximate cause was deficient, but we disagree with the district court on each point. First, the district court stated that the evidence was deficient in that Sigler "offered little to support finding that a second collision occurred." J.A. at 256 (Mem. at 19). Second, even "[a]ssuming the second collision did occur, [Sigler] has offered little to support finding her injuries were caused or enhanced by such second collision. There is nowhere in [Sigler's] proof any statement separating the impact with the tree from the alleged impact with the Accord's interior." J.A. at 256-57 (Mem. at 19-20). Third, Sigler "has not attempted to demonstrate how her injuries would have been different or avoided if the airbag had deployed. . . . [Sigler] has not presented competent medical testimony separating the pre-existing seizure disorder from the allegedly aggravated disorder [Sigler] is currently experiencing." J.A. at 257 (Mem. at 20).

As to the first deficiency, given that both Sigler and her husband offered testimony that she developed a bruise on her head the day after the accident, Sigler's proof adequately presented a genuine issue of material fact that a jury should resolve regarding to the existence of a second collision. This is especially so when combined with Sigler's circumstantial evidence regarding the vehicle's speed just before it veered off the Interstate, which would tend to suggest that the Accord collided with the tree at a speed capable of causing a second interior collision in the absence of the deployment of the Accord's airbag.

As to the second stated deficiency, the district court's reasoning essentially ignores the opinion stated in the Heisser Declaration. Further, the district court's complaint that "[t]here is

nowhere in [Sigler's] proof any statement separating the impact with the tree from the alleged impact with the Accord's interior" seems to pertain to the question of apportioning damages, *not* to any deficiency in proving proximate cause. Indeed, the district court had earlier noted that "'[i]n crashworthiness cases, courts deny recovery unless the plaintiff establishes, by competent expert testimony, that the defect was responsible *to some degree* for enhancement of injury to the plaintiff.'" J.A. at 253 (Mem. at 16) (emphasis added) (quoting *O'Bryan v. Volkswagen of Am.*, Nos. 93-5292, 93-5314, 1994 WL 599450, at \*4 (6th Cir. 1994) (unpublished)). Heisser's opinion that if a second collision occurred, "such trauma to the head more than likely aggravated or exacerbated her preexisting seizure disorder," J.A. at 157 (Heisser Decl.), provides sufficient evidence for a reasonable jury to conclude that the defective airbag "was responsible to some degree" for enhancing Sigler's injuries.

Finally, the district court's third stated deficiency again ignores Dr. Heisser's declaration and also lacks support in the record. The district court ignored Dr. Heisser's declaration in stating that Sigler "has not presented competent medical testimony separating the pre-existing seizure disorder from the allegedly aggravated disorder [she] is currently experiencing." J.A. at 257 (Mem. at 20). The district court's suggestion that Sigler's injuries may not "have been different or avoided if the airbag had deployed" raises an interesting issue, but no evidence exists in the record to support such a theory. *Id.* Certainly, Honda's brochure warns that "airbags inflate with tremendous speed—over 100 mph," that airbags can "cause abrasions and bruises," and that if an occupant "sit[s] too close, or do[es]n't wear a seat belt, or do[es]n't sit in a proper position, an inflating airbag can cause broken bones or more serious injuries." J.A. at 63 (Honda Brochure at 15). According to this information, depending on Sigler's position in her seat, Sigler could possibly have suffered injuries and bruising on her head even if her airbag had deployed properly in a high-speed collision with the tree. But the record lacks any evidence regarding Sigler's position in the car and regarding the likelihood that the deployment of an airbag would cause injuries or bruising similar to that which Sigler experienced. Likewise, Honda has not offered any admissible evidence to support any theory that Sigler's worsened seizure condition stems entirely from the effects of the initial collision, that her deteriorating seizure condition has no connection to a head injury, or that Sigler would likely still have suffered an injury and deterioration in her condition had the airbag deployed properly.

We conclude that Sigler has offered sufficient evidence from which a reasonable jury could find that a defective airbag proximately caused her injuries, and Honda did not produce admissible evidence to support any contrary theory. The Heisser Declaration satisfies Sigler's initial burden of demonstrating that sufficient evidence exists to allow a reasonable jury to find that the defective airbag proximately caused her injuries due to its failure to deploy and prevent a second collision.

## III. CONCLUSION

For the reasons discussed above, we **DENY** Sigler's motion to supplement the record on appeal, **AFFIRM** the district court's order granting Honda's motion in limine as to Jacob B. Griffin, **REVERSE** the district court's ruling that Dr. Heisser's evidence was unreliable and inadmissible, **REVERSE** the district court's order granting summary judgment to Honda, and **REMAND** the case for further proceedings consistent with this opinion.

———————

**DISSENT**

———————

ROGERS, Circuit Judge, dissenting.  This case presents a textbook example of when a district court should grant summary judgment, and the district court properly did so.  Although there was injury, there is no evidence by which a reasonable jury could find a defect in the car.

The car was disposed of prior to the lawsuit.  All agree that there is no basis for finding a defect from the nondeploying airbag unless the plaintiff's car came to a sudden stop while going at least 14 miles per hour.  There is, simply put, no evidence that the car was going that fast when it came to rest.

When a car leaves the highway at 70 miles per hour, it will, without further acceleration, eventually come to rest.  There is no evidence of how far the car went before stopping, other than the fact that it was within sight of the highway.  With regard to the circumstances of the car's coming to rest, plaintiff relies upon the deposition of the plaintiff's husband, who arrived at the scene after the incident.  The deposition provides in relevant part:

Q: Okay.  Tell me what you were able to see when you got to the scene.

A: Well, once you got — you could see where she went through a fence.  And then once you got further, right before — at the bottom there was a small — I don't want to say creek, but it was water.  You could tell right there is where she stopped, because there was trees knocked over, and the fence and the bumper and everything was wrapped up right in there.

. . .

Q: Okay.  Had she gotten to that watery area yet?

A: If the trees hadn't have been there, she would have went in, yes.

Q: Okay.  And when you say some of the trees were knocked over, we are describing these kind of like brush trees that we have along in here?

A: Well, the one that actually stopped the car was — it was probably a good, if I had to guess, six inches or larger around.

Q: Okay.  But it wasn't down?

A: Yes, it was.

Q: Okay.  And do you know whether it came down in the accident, or whether it was down —

A: Well, to the best of my knowledge, to be able to look the way it fell, you know, it brought the roots up, and that's what stopped the vehicle.

Q: Okay.  So, as you're looking at this tree, it's uprooted?

A: Correct.

Q: And is it laying — if you're looking at the — if you're sitting in the driver's seat, is the tree laying —

A: Forward.

Q: — straight forward —

A: Yes.

Q: — straight in front of the car?

A: Yes.

. . .

Q: And where was the bumper relative to the tree?

A: It was wrapped up in with — there was small trees, large trees. I mean, she had pushed everything to this creek bed, what I call it.

Q: Okay.

A: And it's just all mangled up in with the trees and the fence.

Q: Was it — where was it relative to the six-inch tree that you described being uprooted?

A: It was, I believe, on the left-hand side of it. I believe right beside it.

This part of the record was not included in the appendix until after oral argument. It is troubling that plaintiff's brief misleadingly referred to the tree as "a six-inch diameter tree" (Pl. Br. 8), when the evidence shows that the uprooted tree was "six inches *around*" (emphasis added) and thus less than two inches in diameter. It is also troubling that plaintiff's counsel at oral argument indicated that the bumper of the car was "wrapped around the tree," when the evidence shows instead that the bumper was "wrapped up in the trees" and "she [plaintiff] had pushed everything to this creekbed."

Regardless of these mischaracterizations, the key point is that the plaintiff has not presented evidence from which a reasonable juror could find that the airbag was defective. When a car leaves a highway at 70 miles per hour and coasts for an uncertain distance to a stop in wet ground in a bunch of small trees, there is no way that a reasonable juror could conclude, without more, on a more-probable-than-not-basis, that the car was going over 14 miles per hour when it suddenly came to a stop. Summary judgment was therefore not only appropriate, but compelled.

The remaining issues need not be addressed. I would affirm.